UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-20389-ALTMAN/REID

UNITED STATES OF AMERICA

vs.

JULIAN JIMENEZ, and
JAIME SERRANO,

       Defendants.
_____/

### GOVERNMENT'S MOTION FOR IN LIMINE DETERMINATION REGARDING THE ADMISSIBILITY OF DEFENDANTS' STATEMENTS

The United States of America (the "Government") hereby files this Motion for an *in limine Determination Regarding the Admissibility of Defendants' Statements*, and states as follows:

Defendants Jimenez and Serrano each made statements at various junctures of the crimes charged, during the investigation of their crimes, and their subsequent arrests. The statements at issue, as delineated below, are admissible because they are non-hearsay statements. Further, none of the Defendants' statements directly inculpate their co-Defendant, and so, do not violate the strictures of *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny. In fact, the government is not aware of any statement made by either Defendant that implicates Confrontation Clause issues. So, this analysis remains true for the Defendants' statements not contained within the four corners of the instant Motion, and the Government reserves the right to introduce any statement made by either Defendant.

### FACTUAL BACKGROUND and STATEMENTS AT ISSUE

On August 21, 2019, Julian Jimenez and Jaime Serrano flew on the same American Airlines flight from New York's LaGuardia Airport to Miami International Airport in Florida. Just

prior to leaving, Jimenez told E.R., a family member, that he was travelling to South Florida for a construction job. The relevant portions of this statement are attached as Exhibit 1. *See* E.R.'s Statement, Ex. 1. Jimenez also told his father, M.J., that he was travelling to Miami for a construction job. The relevant portions of these statements are attached as Exhibits 2A and 2B. *See* M.J.'s 2021 Statement, Ex. 2A; M.J.'s 2022 Statement, Ex. 2B; *see also* AUSA M.J. Interview Notes, Ex. 2C.[1] These are the initial statements that are the subject of this Motion. In truth and in fact, there was no construction job—Jimenez and Serrano travelled with the intent to surveil A.V., as well as to kill, injure, harass, and intimidate A.V.

Once in the Southern District of Florida, Jimenez and Serrano used a hotel near the airport. From at least August 23, 2019, through on or about August 27, 2019, Jimenez's and Serrano's cellular location data demonstrate that they surveilled A.V. On the evening of August 27, 2019, Serrano drove Jimenez to the area of the victim's residence. Once in the area, Jimenez exited the vehicle brandishing a firearm. He eventually donned a face mask and gloves while walking to A.V.'s residence. Meanwhile, Serrano drove to a pre-determined and agreed upon parking space where the two agreed to meet in order to whisk Jimenez away from the area.

A.V. drove into his residence's garage, and before A.V. could even step out of his vehicle, Jimenez fired multiple rounds into the vehicle, striking A.V. several times. Fortunately, A.V. managed to survive.

Jimenez fled the scene eastbound, through the residential neighborhood, to meet up with Serrano. Jimenez abandoned the mask, the gloves, and the firearm he used to shoot A.V. along his flight path towards Serrano's vehicle. Jimenez entered Serrano's vehicle, and Serrano drove off.

---

[1] The attached exhibit is redacted to include only the statements at issue. The Government is providing the defense with an unredacted version.

Jimenez again contacted his father M.J. Jimenez told M.J. that while Serrano hired him to do construction work in Miami, they did not get paid and Jimenez needed money to return home. Jimenez asked M.J. for money for a flight back to New York. *See* Ex. 2A at 1; 2B at 2; 2C at 1-2. This conversation is also a subject of this Motion. Jimenez's cellular location data then demonstrates that Jimenez flew from Orlando to New York. Serrano's cellular location data, and other evidence, demonstrates that he started driving North through Florida in September and later arrived in New York.

The investigation of the shooting led to Serrano. Eventually, a local detective phoned Serrano and recorded the call. The entire transcript of that recording is attached as Exhibit 3. *See* Serrano-Hendricks Transcript, Ex. 3. In that call, the detective said he wanted to speak with Serrano. Without knowing what it was about, Serrano said, "I have nothing to do with this." *Id*. at 4. This statement is the third subject of this Motion.

As the investigation proceeded, federal agents obtained a search warrant for DNA samples from Jimenez and Serrano. In separate interviews at different times, both Jimenez and Serrano made statements—some truthful and some lies—that are also the subject of this motion. The entirety of Jimenez's statements are contained in the transcript attached as Exhibit 4 and the complete transcript of Serrano's statements are attached as Exhibit 5. After his meeting with the FBI, Jimenez had a conversation with his father, M.J., essentially implicating himself in the crime, which is also part of this Motion. *See* Ex. 2C at 2. Finally, Serrano made statements to A.O., his fiancée, after his arrest approximately a month later, that are also the subject of this Motion.[2]

---

[2] The government plans to supplement this Motion with a transcript of the relevant portions of this recording. The recording in its entirety has already been produced to defense counsel.

## **MEMORANDUM OF LAW**

The statements at issue are admissible as non-hearsay and do not violate the rule announced in *Bruton* and its progeny. The statements are not hearsay because they fall into one or more definitional exclusions: (1) they are not offered for their truth; (2) they are party opponent statements uttered by the party opponent; and (3) they are party opponent statements because they were made by a co-conspirator. Statements that are not hearsay, are non-testimonial, or are not clearly inculpatory of a co-defendant do not violate *Bruton*. Each statement falls into at least one, if not more, of the aforementioned categories.

## **APPLICABLE LAW**

*Bruton v. United States*, 391 U.S. 123, 135-36 (1968) held that the Confrontation Clause prohibits using the confession of a non-testifying criminal defendant in a joint trial if the statement directly inculpates a co-defendant, even if it may be otherwise admissible against the confessing defendant. *United States v. Hano*, 922 F.3d 1272, 1286 (11th Cir. 2019). The Supreme Court clarified that the Confrontation Clause prohibits only the introduction of testimonial hearsay statements. *Id*. at 1287 (citing *Whorton v. Bockting*, 549 U.S. 406, 419–20 (2007); *Whorton*, 549 U.S. at 419-20 ("Under *Crawford* . . . the Confrontation Clause has no application to [out-of-court nontestimonial statements] and therefore permits their admission even if they lack indicia of reliability."); *Davis v. Washington*, 547 U.S. 813, 823–24 (2006) (same). "The Constitution as construed in *Bruton*, in other words, is violated only where *the out-of-court hearsay statement* is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination."). *Delva v. United States*, 851 F. App'x 148, 153 (11th Cir. 2021) (internal citations omitted) (emphasis added) (quoting *Nelson v. O'Neil*, 402 U.S. 622, 627). As a result, "[t]he threshold question in

4

every case" raising a *Bruton* issue "is whether the challenged statement is testimonial."[3] *Hano*, 922 F.3d at 1287.

But what is a testimonial statement? An out-of-court statement is testimonial if its purpose is to "creat[e] an out-of-court substitute for trial testimony," *Ohio v. Clark*, 576 U.S. 237, 244 (2015), or made with the primary purpose to establish facts potentially relevant to later criminal prosecution. *Davis v. Washington*, 547 U.S. at 822. In short, a statement is testimonial when offered to establish some fact. So, lies—by their very nature—cannot be testimonial. Courts evaluate the "primary purpose" of a hearsay statement objectively, based not on the subjective intent of the individuals involved, but on "all of the relevant circumstances," including the statements and actions of all participants, even interrogators. *Michigan v. Bryant*, 562 U.S. at 369-70. A "casual remark to an acquaintance" is not testimonial. *Crawford v. Washington*, 541 U.S. at 51-52; *see United States v. Brown*, 441 F.3d 1330, 1360 (11th Cir. 2006) (concluding that a private phone conversation between a mother and her son, made while inside a house with family members present, was nontestimonial and so, could be testified to by a person who overheard the conversation). When the statement at issue "was not made under examination, was not transcribed in a formal document, and was not made under circumstances leading an objective person to

---

[3] In *United States v. Jiminez*, 564 F.3d 1280 (11th Cir. 2009), the Court stated "[t]here can be no doubt that the Confrontation Clause prohibits *only* statements that constitute impermissible hearsay." *Id.* at 1286 (emphasis in original). Later, in *United States v. Charles*, 722 F.3d 1319 (11th Cir. 2013), this Circuit clarified that statement. Relying on *Crawford*, the Eleventh Circuit concluded that, when testimonial evidence is at issue, what matters is the unavailability of and a prior opportunity to cross-examine the declarant; merely analyzing the challenged testimony under the Federal Rules of Evidence governing hearsay cannot satisfy the Confrontation Clause. *See Charles*, 722 F.3d at 1328 n.10 ("As *Crawford* instructs, a proper Confrontation Clause analysis does not begin or end with a determination of whether a statement constitutes 'impermissible hearsay.' Instead, a proper analysis first requires a determination of whether the declarant's statement is 'testimonial,' *i.e.* a declaration offered for the purpose of proving some fact to be used at trial, and if so, the Sixth Amendment is satisfied only if the declarant is unavailable and there was a prior opportunity for cross-examination." (quoting *Crawford*, 541 U.S. at 68)).

reasonably believe the statement would be available for use at a later trial," it is admissible under *Crawford*. *Id.* (collecting cases). If a "friendly and informal" conversation occurs when "no future prosecution was on the horizon," a defendant "was not presently under investigation and had no reason to believe that his statements to [a future witness] would ever be used in court," then the contents of that conversation are non-testimonial and do not trigger *Bruton*. *Hano*, 922 F.3d at 1287.

To implicate *Bruton*, the statement must not only be testimonial, but it must also be hearsay. A statement—even a testimonial one—does not trigger *Bruton* when it is introduced for a reason other than the truth of the matter asserted. *See, e.g., Tennessee v. Street*, 471 U.S. 409, 414 (1985) ("The *nonhearsay* aspect of [the non-testifying accomplice's] confession—not to prove what happened at the murder scene but to prove what happened when respondent confessed—raises no Confrontation Clause concerns."). This is because "*Bruton* applies only to statements that are inadmissible hearsay[.]" *United States v. Ayarza-Garcia*, 819 F.2d 1043, 1049 (11th Cir. 1987). This makes sense. The purpose of the Confrontation Clause is to require the confrontation of witnesses bearing testimony against the accused. *See Crawford*, 541 U.S. at 60 ("[T]he Clause's ultimate goal is to ensure reliability of evidence" and that "reliability be assessed in a particular manner: by testing in the crucible of cross-examination."). And so, where hearsay is not implicated, neither is *Bruton*. *See Crawford*, 541 U.S. at 59 n.9 (the ["Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *United States v. Cooper*, 926 F.3d 718, 730 (11th Cir. 2019) (observing that when "claims do not involve testimonial statements," then "Confrontation Clause challenges fail as a matter of law").

6

A defendant's out-of-court statement offered by the prosecution for its truth against that defendant is not hearsay. Fed. R. Evid. 801(d)(2)(A). A Confrontation Clause problem arises when that statement—offered for its truth against the non-testifying declarant—directly inculpates a co-defendant at a joint trial. But if that same statement is not offered for its truth or it does not directly implicate the co-defendant in a joint trial, then *Bruton* and the Confrontation Clause do not apply.

"Directly implicates" means the statements directly incriminate a defendant *without* reference to other trial evidence. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987) (finding no *Bruton* problem where non-testifying co-defendant's statement "was not incriminating on its face, and became so only when linked with evidence introduced later at trial"); *see United States v. Joyner*, 899 F.3d 1199, 1206-07 (11th Cir. 2018) (finding that "[n]one of the statements challenged by Joyner was 'clearly inculpatory standing alone,' and thus no error has been shown"). Statements powerfully incriminating a co-defendant are inadmissible at a joint trial. *Bruton*, 391 U.S. at 135-36. A statement is "powerfully incriminating" if it "directly" incriminates the defendant. *United States v. Foree*, 43 F.3d 1572, 1578 (11th Cir. 1995); *United States v. Arias*, 984 F.2d 1139, 1142 (11th Cir. 1993). In other words, a defendant's right to confront witnesses "is violated when the court admits a codefendant['s] statement that, in light of the Government's whole case, compels a reasonable person to infer the defendant's guilt." *United States v. Schwartz*, 541 F.3d 1331, 1351 (11th Cir. 2008); *see also United States v. Butler*, 102 F.3d 1191, 1197 (11th Cir. 1997) ("Under *Bruton*, a non-testifying codefendant's statement is inadmissible if the statement facially incriminates another defendant."); *See United States v. Dale*, 614 F.3d 942, 959-60 (8th Cir. 2010) ("[A] *Bruton* violation must be predicated on a *testimonial* out-of-court statement implicating a co-defendant." (emphasis in original)).

Therefore, a statement by a non-testifying defendant at a joint trial that references an accomplice—whether redacted, referred to by pronouns, or some other moniker—violates the Confrontation Clause if the jury can figure out that the unmentioned accomplice is the co-defendant. "If, however, the statement does not *facially* incriminate another defendant but merely becomes incriminating after being linked with evidence that is later introduced at trial, the statement may be introduced if redacted so as 'to eliminate not only the defendant's name, but any reference to his or her existence.'" *Butler*, 102 F.3d at 1197 (quoting *Richardson v. Marsh*, 481 U.S. at 208). "The Confrontation Clause has never been held to bar the admission into evidence of every relevant extrajudicial statement made by a non-testifying declarant simply because it in some way incriminates the defendant." *Parker v. Randolph*, 442 U.S. 62, 73 (1979). Rather, the Eleventh Circuit "has read *Bruton* to exclude only those statements by a non-testifying defendant which *directly* inculpate a co-defendant." *United States v. Arias*, 984 F.2d 1139, 1142 (11th Cir. 1993).

Sometimes statements by one non-testifying defendant are admissible against a co-defendant. A statement offered against an opposing party is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). As non-hearsay, it does not implicate *Bruton*. *See Hano*, 922 F.3d at 1287 ("[T]he Confrontation clause prohibits *only* the introduction of testimonial hearsay statements."). *Crawford* itself specifically noted that most hearsay exceptions addressed statements that "by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy." 541 U.S. at 56. Statements furthering a conspiracy are "just as reliable as cross-examined in court testimony"—and their admission advances the Confrontation Clause's goal of promoting accurate testimony—because such statements "are made while the declarant and the accused are partners

in an illegal enterprise." *Id.* at 73 (Rehnquist, C.J., concurring) (citing *United States v. Inadi*, 475 U.S. 387, 395 (1986)).

In order for a co-conspirator statement to be admissible, "the government must prove by a preponderance of the evidence that: (1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy." *United States v. Harris*, 886 F.3d 1120, 1131 (11th Cir. 2018). "[The Eleventh Circuit Court of Appeals] applies a liberal standard in determining whether a statement is made in furtherance of a conspiracy." *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988).

## THE STATEMENTS AT ISSUE

Jimenez's and Serrano's statements should be admitted as evidence at their joint trial. Jimenez's and Serrano's statements (non-hearsay and hearsay) are admissible in a joint trial under an array of evidentiary theories—party opponent admissions, co-conspirator statements furthering the conspiracy, false exculpatory statements—as delineated below. Particularly important in a trial with multiple defendants, none of Jimenez's and Serrano's statements inculpate their respective co-Defendant and so, admitting these statements does not create a *Bruton* issue. Each statement is addressed below.

### I.     Jimenez's Statements About a Construction Job

Both before and after the attempted murder of A.V., Jimenez made several statements about traveling to South Florida for a construction job—a job for which the government has yet to find any corroborating evidence. Rather, Jimenez's cell-site records clearly indicate he did not remain confined to any one location long enough to engage in construction work in South Florida. Similarly, the FBI has not found any evidence, nor interviewed any witnesses—including other

family members—evincing that Jimenez did any construction work before, during, or after his time in Miami in August 2019.

   A. *Jimenez's Statements to E.R.*

Before Jimenez flew to Miami, he told E.R., his cousin, that he was travelling from New York to Florida in August 2019 for a construction job. *See* Ex. 1 at 1-2. Importantly, Jimenez never said anything to E.R. about Serrano, whom she knows.

This statement is inconsistent with a statement Jimenez gave to the FBI when agents met him to execute a DNA warrant, discussed more fully below. In that meeting, Jimenez said he had travelled to Miami to for "a little vacation" because, at the time, he was having issues with the mother of his child. He said he travelled alone from New York to Miami and had mostly remained confined to a hotel. But airline records, and other evidence, demonstrate he did not travel alone—records show Jimenez travelled with Serrano, resided at a hotel Serrano paid for, and drove about town with his cellular telephone "pinging" off towers consistent with Serrano's cellular telephone. Both Defendants cellular telephones also "pinged" off towers near where the victim worked and lived in August 2019.

Jimenez's statements to E.R. about the construction job are admissible against Jimenez and Serrano in a joint trial. First, this statement is not offered for its truth—it is, in fact, a lie—and so, is not hearsay, avoiding any Confrontation Clause concerns. *See, e.g., United States v. Curbelo*, 726 F.3d 1260, 1272 (11th Cir. 2013) ("The Confrontation Clause only applies to testimonial statements that are used to establish the truth of the matter asserted." (internal quotations omitted)).

But even if the statement were introduced for the truth of its contents, this statement is not testimonial, and so does not implicate *Bruton*. Jimenez made the statements to E.R.—a person whom Jimenez, his father, and E.R. herself all indicate is like a sister to him. It was said in a casual

10

exchange. *See Brown*, *supra*. *See also Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.")); *accord United States v. Underwood*, 446 F.3d 1340, 1347 (11th Cir. 2006) (recorded conversations between defendant and confidential informant did not qualify as "testimonial.").

And avoiding even a hint of a *Bruton* concern, these statements do not mention Serrano and so cannot inculpate him. Admittedly, the jury in a joint trial will eventually learn Jimenez lied about the construction job, and that instead he flew down to South Florida—with Serrano—on the same plane, a day after making the reservation. And, instead of working construction together, Jimenez and Serrano stalked and surveilled the victim, then drove to his house together. The jury will learn that Jimenez shot the victim, and that Serrano drove Jimenez away from the scene.

But, presenting evidence that Jimenez and Serrano travelled to Miami together, not to work construction but to commit the crimes charged, does not transform Jimenez's words into evidence directly incriminating Serrano. *See United States v. Joyner*, 899 F.3d 1199, 1206-07 (11th Cir. 2018) (finding that "[n]one of the statements challenged by Joyner was 'clearly inculpatory standing alone,' and thus no error has been shown").[4]

---

[4] This statement and others the Government seeks to introduce bear no resemblance to the statements at issue in *United States v. Beale*, where the Government's only evidence—besides uncorroborated testimony—connecting a defendant to a string of armed robberies was a co-conspirator's post-*Miranda* (and thus testimonial) statement he knew the defendant by the nickname "Bee." 921 F.2d 1412, 1425 (11th Cir. 1991). Admittedly, the alias "Bee"—standing alone—was not directly inculpatory. *See id.* But when assessed alongside the rest of the Government's case, the testimonial statement the defendant went by "Bee"— introduced to prove that the defendant did, in fact, go by "Bee"—was the only evidence linking the defendant to the charged conspiracy. *Id. Beale* stands in stark contrast to the instant case since there, the defendant was entitled to a new trial because of the lack of corroborating evidence the defendant used the alias. *Id.* Here, none of the Defendants' statements comprise the only evidence of their knowledge of one another or their engaging in a conspiracy together. Flight records, receipts, cell phone call

In *Joyner*, the defendants, Lloyd Joyner and Dave Sturgis, brandished firearms during the course of a drugstore robbery spree. *Id.* at 1202. At a joint trial, the court permitted testimony regarding Sturgis's facially innocuous statements to an agent: that Sturgis had stayed at Joyner's apartment for several nights; that Sturgis had driven with Joyner to a drugstore the night of their arrest; and that Sturgis had kept a firearm in the car he and Joyner were arrested in. *Id.* Joyner objected to admitting these statements on *Bruton* grounds. *Id.* He argued Sturgis's statements inculpated Joyner once linked with other evidence, including the alleged robberies' timeline and a second firearm discovered in the car both defendants were arrested in. *Id.* But evidence that is only a "link in the chain"—even the kind that mentions a co-defendant by name—is "precisely the kind of statement that poses no *Bruton* problem." *Id.* Such is the case with Jimenez's statements to E.R. as well the other statements addressed in this Motion.

B.  *Jimenez's Statements to M.J.*

Jimenez's conversation with E.R. was not his only statement about a construction job. In a phone call, Jimenez told his father, M.J., that he was going to Miami for construction work. In a subsequent phone call—after the shooting—Jimenez told M.J. that Serrano hired him for a construction job in Miami, that they did not get paid, and he needed money for a flight back to New York. At his son's request, M.J. provided Jimenez money for the return flight. *See* Ex. 2A at 1; Ex. 2B at 1; *see also* Ex. 2C at 1-2. This call occurred before Jimenez flew out of the airport in Orlando, Florida, which is corroborated by cell-site records.

Like Jimenez's statement to E.R., the government does not offer Jimenez's statements about being hired for a construction job for their truth. In fact, these words are lies—there was no

---

records, and cell-site analysis all corroborate their relationship and their conspiring to stalk and kill A.V. together.

construction job. The statement to M.J. is not testimonial because it was made in a casual exchange. Unlike the statement to E.R., this statement mentions Serrano. However, it is not directly, facially inculpatory as to Serrano because it declares that Serrano came down for a construction job. As set forth above, in light of the landscape of cases on the subject, a jury's conclusion that Jimenez lied about a job—involving Serrano—is not the kind of inescapable conclusion necessitating Jimenez's cross-examination.

### C. Jimenez's Statements to E.R. and M.J. Are Co-Conspirator Statements Furthering the Conspiracy

Jimenez's statements, both to E.R. and M.J., do not implicate the Confrontation Clause for another reason—they are statements by a co-conspirator made in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E); *see also United States v. Wilson*, 788 F.3d 1298, 1316 (11th Cir. 2015) ("Certain statements by their nature are not testimonial—for example, business records or statements in furtherance of a conspiracy." (citing *Crawford*, 541 U.S. at 56)). As statements by a co-conspirator furthering the conspiracy, and thus by Rule 801's definition not hearsay, they may also be offered for their truth. Cell-site analysis, flight records, rental car records, and cell-phone records show not only that a conspiracy existed between Jimenez and Serrano to stalk, surveil, and gun down the victim A.V., but that Jimenez and Serrano carried out the conspiracy's aim. To qualify under Fed. R. Evid. 801(d)(2)(E), the statement must also be in furtherance of the conspiracy. "The statement need not be necessary to the conspiracy but must only further the interests of the conspiracy in *some* way." *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002) (emphasis added). "Statements which serve as a necessary part of a conspiracy by concealing it or impeding an investigation are admissible as statements made during and in furtherance of the conspiracy." *United States v. Blakey*, 960 F.2d 996, 998 (11th Cir. 1992) (citing *United States v. Griggs*, 735 F.2d 1318, 1325 (11th Cir. 1984)); *see also United States v. Manfre*,

13

368 F.3d 832, 839 (8th Cir. 2004) ("A statement of a conspirator which conceals the conspiracy without revealing any of the conspirators' illegal objectives from one who appears suspicious is in furtherance of the conspiracy and thus would be admissible under Rule 801(d)(2)(E)."). Jimenez's lies to both E.R. and M.J. about having a construction job in Miami furthered the conspiracy by concealing why he and Serrano were travelling to Miami. Jimenez's conversations with his father immediately following the shooting concealed the true purpose of Jimenez and Serrano's trip as well as what they had just done. Importantly, Jimenez's statements to his father M.J. also facilitated Jimenez's flight from Florida independent of Serrano's, further concealing their conspiracy.

## II. Serrano's Statement to the Local Detective

Eventually, Det. Larry Hendricks of the Miami Dade Police Department, contacted Serrano by phone and recorded the call. *See generally* Ex. 3. Det. Hendricks attempted to schedule a time with Serrano—who said he was in New York at the time—to return to South Florida and meet with then-lead investigator Det. Julius Matus of the Miami Dade Police Department. *Id.* at 1-9. Det. Hendricks never told Serrano why Det. Matus wanted to speak with him. *Id.* Despite Serrano's requests, Det. Hendricks refused to explain the subject matter beyond that it related to an investigation. *Id.* at 3-5. Det. Hendricks asked Serrano when he would be back in South Florida, so they could schedule a time to speak. *Id.* at 1-5. Serrano said he would return in about a month. *Id.* at 1. In response to further attempts to set a date, Serrano said, "You can talk to my lawyer. 'Cause I don't know what, like, I have nothing to do with this. Whatever it is, you could've just told me like, 'Listen we have a situation . . .'" *Id.* at 4.

Before hanging up, Det. Hendricks gave Serrano Det. Matus's name and phone number. Det. Hendricks told Serrano they belonged to the Kendall District of the Miami Dade Police Department, adding, "I'm sure you're familiar with Kendall." *Id.* at 8-9. Serrano responded, "Not

14

really." *Id.* Most of the conversation centered around scheduling a time for Serrano to speak with Det. Matus. While Serrano agreed to call Det. Matus, Det. Matus never received a phone call from Serrano at the phone number Det. Hendricks provided.

Even though Serrano's statements to Det. Hendricks may qualify as testimonial—since they arose in response to questioning by a law enforcement officer—the government does not seek to introduce these false exculpatory statements for the truth of the matter asserted, avoiding any Confrontation Clause concerns. *See Crawford*, 541 U.S. at 53 ("[E]ven if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object[.]") Serrano's knee-jerk response that he had nothing to do with "this," even though Serrano had yet to hear what the subject of the conversation was, evinces that Serrano *did* know what the detective was calling about—the attempted murder. Serrano's denying he had been in the area reveals his consciousness of guilt. Importantly, these statements do not facially or directly implicate Jimenez—they do not even mention him. Because Serrano's statements to Det. Hendricks are not being introduced for the truth of their contents and do not facially incriminate Jimenez, admitting these statements raises no *Bruton* issue at a joint trial where Serrano does not testify.

**III.     Jimenez's Statements Before and After the Execution of a DNA Warrant**

Like Jimenez's other statements, his statements surrounding the execution of a DNA warrant are admissible in a joint trial because, at a bare minimum, they do not inculpate Serrano—Jimenez's only statement even mentioning Serrano is his admitting he knows his co-Defendant—and so, do not violate *Bruton*.

*A. Jimenez's Statements to FBI Agents Before the Execution of a DNA Warrant*

On June 28, 2022, FBI agents flew to New York to execute a search warrant on Jimenez for a DNA sample. In an interview at that time, Jimenez admitted to being in Miami during the

15

relevant time period and staying in a hotel. *See* Exhibit 4. Jimenez also said he flew alone to Miami to take a "little vacation" because he was having domestic issues with the mother of his child. According to Jimenez, he didn't venture far from the hotel until leaving Miami to visit family in Orlando. Agents showed him photographs of the gloves, mask, and firearm recovered from the scene and asked if he recognized them. Jimenez said he did not. Agents showed him a still from a surveillance video depicting the shooter wearing those gloves and mask. Jimenez, again, said he did not recognize the person in the still. Notably, Jimenez's DNA was later found on the mask and glove. Jimenez initially denied knowing Serrano, but when confronted with the fact they had traveled on the same plane to Miami, admitted to knowing him.

Here, unlike the previous statements, these statements are surely testimonial. But they do not directly, facially incriminate Serrano, avoiding any *Bruton* concern. Again, these statements do not even mention Serrano, but for Jimenez's simply admitting he knows his co-Defendant. They are also admissible against Jimenez as non-hearsay, party opponent admissions. Some of the statements are true. Some are false. And, as false exculpatory statements that do not even incriminate Serrano, Serrano does not have a right to cross-examine Jimenez on these statements. *See United States v. Rubio*, 709 F.2d 146, 154-55 (2d Cir. 1983) (rejecting defendant's claim that admitting co-defendant's post-arrest exculpatory statements, which mentioned her, violated *Bruton* since the statements were "non-inculpatory"). But in a joint trial, they are all admissible against Jimenez (and the Court may provide a limiting instruction to that effect).

### B. Jimenez's Statements to his Father M.J. After Agents Executed the DNA Warrant

After speaking with FBI agents, Jimenez called his father M.J. Ex. 2C at 2. Jimenez told M.J. he had just met with the FBI and provided a DNA sample. *Id.* Jimenez said he would turn himself in to authorities and that he was sorry. *Id.* In response, M.J. asked Jimenez to "rat" on

16

whoever put Jimenez up to this crime. *Id.* Jimenez responded, in substance, that while he would turn himself in, there was nothing to "rat" about to anyone. *Id.* Jimenez then added, "I don't know what you're talking about," before hanging up the phone. *Id.* Jimenez did not turn himself in to authorities.

Like Jimenez's other statements, these statements are admissible in a joint trial because they are neither testimonial nor inculpating of Serrano—the statements do not even mention Serrano—and so, cannot implicate *Bruton*.

IV. **Serrano's Statements at the Meeting for a DNA Sample**

As with Jimenez, FBI agents flew to New York and executed a DNA search warrant on Serrano on June 28, 2022. In an interview before obtaining DNA samples from Serrano, Serrano spoke with law enforcement. Serrano's 2022 Statement, Ex. 5. Serrano's statements are admissible as party opponent admissions and false exculpatory statements. Serrano explained how he often traveled to Florida, including Miami, and he had been visiting Miami in August 2019. *Id.* at 10-30. Serrano stated he did not know anyone named "Julian Jimenez." *Id.* at 38, 45. When agents asked Serrano if he had flown down to Miami with Jimenez, Serrano again denied knowing Jimenez. *Id.* at 48. Serrano also denied knowing the victim A.V. *Id.* at 40. And, when asked if anyone had stolen Serrano's cell phone back in August 2019, Serrano said no one had. *Id.* at 44. Agents asked if Serrano would let them check his cell phone for Julian Jimenez's contact information. *Id.* at 50-52. Serrano denied the agents access to his phone. *Id.*

Once again, some of these statements are false, some are true. The government seeks to introduce some for the truth of their contents, and others as impeachment material. While the context suggests these are testimonial statements, what matters is that Serrano's words—lies and

17

truths—do not inculpate anyone besides himself. So, Jimenez has no Confrontation right as to these statements, and they are admissible in a joint trial.

### V.     Serrano's Post-Arrest Statements

Agents arrested Serrano several months after execution of the aforementioned DNA search warrants. Agents read Serrano his *Miranda* rights—which Serrano acknowledged he understood—and Serrano then invoked his right to counsel. The agents did not question Serrano. Serrano asked to call his son and his wife, A.O., and the agents provided Serrano one of their own phones. Serrano called A.O. on "speaker phone" mode. Serrano made statements to A.O. regarding detention, bond, locations of hearings, and an outstanding rental vehicle. When discussing procedures and legal representation, Serrano said, in effect, "Remember, we discussed this." He made no statements regarding Jimenez.

### CONCLUSION

For the reasons stated above, the Government requests that the Court grant the requested relief and permit the Government to introduce the aforementioned statements.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:  */s/ Abbie Waxman*
     Abbie Waxman
     Assistant United States Attorney
     Fla Bar. No. 109315
     99 N.E. 4th Street
     Miami, FL 33132-2111
     Tel: 305-961-9240
     Email: Abbie.Waxman@usdoj.gov

     */s/ Katherine Guthrie*
     Katherine Guthrie
     Assistant United States Attorney
     Court ID No. A5502786

18

        99 N.E. 4th Street
        Miami, FL 33132-2111
        Tel: 305-961-9117
        Email: Katherine.Guthrie@usdoj.gov

        */s/ Michael E. Gilfarb*
        Michael E. Gilfarb
        Assistant United States Attorney
        Fla. Bar. No. 957836
        99 N.E. 4th Street
        Miami, FL 33132-2111

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on June 10, 2023, I served a copy upon all counsel of record using CM/ECF.

        By:  */s/Katherine W. Guthrie*
                Katherine W. Guthrie
                Assistant United States Attorney