UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **22-CR-20389-ALTMAN/REID**

UNITED STATES OF AMERICA

vs.

JULIAN JIMENEZ, *et al.*

        **Defendants.**
_____/

## GOVERNMENT'S MOTION IN LIMINE

The United States of America files this *Motion in Limine* for a pre-trial determination of the following evidentiary matters:

**I.**    **FBI Agent Offers Lay Opinion Testimony Regarding Cellular Tower Locations**

The Government will call FBI Special Agent (SA) Ryan Dreibelbis as a summary witness offering lay opinion testimony. Agent Dreibelbis will testify concerning his use of cellular telephone records to plot the defendants' locations at particular times based on which cellular towers they used and also based on iCloud location data.[1] Agent Dreibelbis plotted those points on maps already provided to the defense. Pursuant to Local Rule 88.9, the Government conferred with Defendant Jimenez and Defendant Serrano who each object, asserting that such testimony is the subject of expert, not lay, testimony.

An FBI agent offers admissible lay witness testimony—not expert opinion—when using cellular telephone records, including cell phone tower records, to testify regarding a defendant's location at particular times. *See United States v. Batista*, 558 F. App'x 874, 876 (11th Cir. 2014)

---

[1] iCloud location data attached to photographs or videos consists of longitude and latitude coordinates that, like cell tower locations, can be inputted into a map to designate where and when a photograph or video is uploaded to iCloud.

(ruling that lower court's admitting FBI agent's lay testimony and map agent produced by relying on defendants' cell phone records and phone companies' records of cell tower locations). Permitting this testimony is not an abuse its discretion. *Id*. at 876. In *Batista*, an FBI agent plotted which cell towers connected with which defendant's cell phone at a particular point in time on a map. *Id.* In doing so, the agent relied on the defendants' cell phone records and the cell phone companies records of their cell phone towers' locations. According to the Eleventh Circuit, the testimony qualified as admissible lay opinion since all the agent had to do was read the cell phone records to determine which cell tower was used at a particular time, look up the latitude and longitude of that cell tower in the companies' records, and mark the intersection of the latitude and longitude on a map. *Id. See also United States v. Jeri*, 869 F.3d 1247, 1265 (11th Cir. 2017) ("Lay witnesses may draw on their professional experiences to guide their opinions without necessarily being treated as expert witnesses."); *accord United States v. Caniff*, 955 F.3d 1183, 1195 (11th Cir. 2020) ("[J]ust because a lay witness's position and experience could have qualified him for expert witness status does not mean that any testimony he gives at trial is considered 'expert testimony.'" (quoting *Jeri,* 869 F.3d at 1265)); *United States v. Feliciano*, 300 F. App'x 795, 801 (11th Cir. 2008) (testimony by a law enforcement witness about historical cell site data was opinion lay testimony because the witness, a detective, did not express an expert opinion based on scientific, technical, or other specialized knowledge).

In addition, SA Dreibelbis's summary charts are supported by the evidence the Government intends to introduce and so, are themselves admissible. *United States v. Maurya*, 25 F.4th 829, 840 (11th Cir. 2022); *see United States v. Richardson*, 233 F.3d 1285, 1293-4 (11th Cir. 2000) (permitting "summary charts incorporating certain assumptions so long as supporting evidence has been presented previously to the jury" and the court "made it clear that the ultimate

decision should be made by the jury as to what weight should be given to the evidence" (cleaned up)). Admitting a summary chart requires the court make clear that the jury ultimately decides the weight of that evidence. *Richardson*, 233 F.3d at 1294.

## II. An FBI Agent Offers Summary Evidence in the Form of a Timeline

The Government will call FBI SA Ryan Dreibelbis as a summary witness who will use information introduced into evidence, too voluminous to access and review in court, to create a timeline of the Defendants' whereabouts and activity for the relevant time period covering the alleged acts. Pursuant to Local Rule 88.9, the Government has conferred with counsel for the Defendants. Defendant Jimenez agrees that a timeline chart could fall under Rule 1006 or qualify as a demonstrative. Defendant Jimenez reserves the right to object to any timeline on other grounds. Meanwhile, Defendant Serrano has no objection to timeline testimony provided it is given by a witness with the appropriate knowledge.

Creating and introducing into evidence a timeline is permissible when it will help the jury understand voluminous records, and the timeline fairly summarizes evidence. *See, e.g.*, *United States v. Ho*, 984 F.3d 191, 210 (2d Cir. 2020) ("This court has long approved the use of charts in complex trials, and has allowed the jury to have the charts in the jury room during its deliberations, so long as the judge properly instructs the jury . . . that it is not to consider the charts as evidence."); *United States v. Abou-Khatwa*, 40 F. 4th 666, 686 (D.C. Cir. 2022) (finding summary witness' testimony and summary charts, which relied on cross-referencing invoices, was permissible); *United States v. Borders*, 829 F.3d 558, 567 (8th Cir. 2016) ("Summary evidence is proper when it assists the jury in understanding the testimony already introduced and fairly summarizes trial evidence." (internal quotation marks omitted)); *United States v. Chivers*, 488 F. App'x 782, 785 (5th Cir. 2012) (quoting *United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001)) ("Summary

charts in particular are admissible when (1) they are based on competent evidence already before the jury, (2) the primary evidence used to construct the charts is available to the other side for comparison so that the correctness of the summary may be tested, (3) the chart preparer is available for cross-examination, and (4) the jury is properly instructed concerning use of the charts."); *United States v. Olsen*, 704 F.3d 1172, 1185 (9th Cir. 2013) (noting government introduced summary evidence at trial—consolidating 20,000 pages of evidence—along with a timeline showing defendant's internet activity).

In this case, the stalking statute charged in Count 1 of the Indictment requires proof that the defendants travelled in interstate commerce to, in part, "place under surveillance with intent to kill, injure, harass, or intimidate another person." The Defendants—while in South Florida—did exactly this for six (6) days. But that is not all they did. The Defendants' time away from stalking the victim is just as relevant because it demonstrates how they repeatedly reunited to continue surveilling—and eventually attack—the victim. The Defendants' time apart from each other, particularly after the attack, shows how the two eventually—and separately—fled, each returning to their home state of New York. Once separated, and while still in Florida, each engaged in additional activity until August 31, 2019, (for Defendant Jimenez) and September 10, 2019 (for Defendant Serrano)—for an additional four (4) days and fourteen (14) days of activity, respectively. The Government intends to prove this surveillance and flight by relying on cell-site data for three separate telephones, iCloud data, Instagram data from two different accounts, photographs, banking records, airline records for at least three people, Lyft data, rental car records, Sunpass records, Miami-Dade Expressway Authority records, car purchase records, and Florida Department of Transportation records. On June 5, 2022, Defendant Jimenez characterized the

state of discovery as "69,700 banker's boxes of printed paper."[2]  Since that time, the Government has produced even more data.  The information supporting the timeline is extraordinary and not in chronological order.  Setting out the Defendants' activity in chronological order given all the data is important for the jury to understand who did what, when, and where.  Without a timeline, there is simply no other way to digest this voluminous information.

      As an example of the complexity involved in contextualizing all this information, the cell-site expert created a report documenting the Defendants' "pinging" cell towers at or near the victim's business and residence. On just one particular day, the Defendants "ping" near and around the victim's residence and business, their phones moving from tower to tower—sometimes their phones using the same towers, and other times different towers from each other.  Separating fourteen days of "pings" into chronological order required hours of work by the Government.  *See e.g.* Exhibit 1 A, B of plotted data.  Cell-site data is only one source used for the proposed timeline. It is simply impossible for a jury to understand during trial or deliberations what transpired without a streamlined, chronological organization of pertinent events as contained within over 69,000 banker's boxes.  As such, Agent Dreibelbis will serve the function that serves the very purpose of Rule 1006.  *C.f.*, *United States v. Francis*, 131 F.3d 1452, 1457-58 (11th Cir. 1997) (noting court may admit summaries where it would be "inconvenient or unnecessarily time-consuming" to review the summarized evidence, even including taped conversations).  Further, it is not realistic to expect the jury to just remember what they saw and heard regarding this timeline during trial if it is limited to being only a demonstrative aid. Therefore, the Court should exercise its discretion to admit the timeline into evidence consistent with authority cited above.

---

[2] "IT staff at the Federal Public Defender's Office estimates the total quantity of data received to date exceeds 697GB, which quantity of data would fill approximately 69,700 banker's boxes if it was all printable documents." [ECF 129] at 3-4.

### III. The Government Will Call Hostile Witness(es) To Testify

The Government seeks to use leading questions during the direct examination of various witnesses who are identified in strong and intimate ways with the defendants and/ or who are hostile against the Government. This is permitted under Fed. R. Evid. 611(c). For example, the Government will call M.J. and E.R. to testify. They are Defendant Jimenez's father and cousin, respectively, and both E.R. and M.J. have said E.R.'s relationship with Defendant Jimenez more closely resembles that of a sibling. Each of these witnesses is identified with Defendant Jimenez as an adverse party. M.J. is Defendant Jimenez's father and has denied information to the FBI that he freely admitted to others. He has explained the very difficult position he is in given that his son is accused of shooting the very good friend of his high profile, longtime friend and employer. He has spoken with Defendant Jimenez and the defense team. He has expressed remorse for ever giving information that was used to incriminate his son. E.R., the Defendant Jimenez's "sister," who housed Defendant Jimenez in New York, changed her testimony between interviews, even recently remembering a huge swath of information she specifically denied in earlier interviews. She specifically denies incriminating information that M.J. says she provided him. Another example is Government witness A.O.—Defendant Serrano's fiancée and mother to his one-year-old child. A.O. engaged in an attempt to deceive the FBI about Defendant Serrano's whereabout in New York when he was inside their house the whole time. The agents have contacted her periodically as information has come up, including, but not limited to, proof that Defendant Serrano was having affairs. Understandably, A.O. has grown increasingly hostile toward government agents over time. A.O. has rejected Government attempts to arrange travel and housing for trial, and she has not answered about where she is staying once in South Florida.

Despite this hostility, and despite allegedly having no direct knowledge of Defendant Serrano's criminal conduct and no exculpatory information, A.O. has expressed her eagerness to testify.

After conferring with defense counsel under Local Rule 88.9, Defendant Jimenez and Defendant Serrano both assert that the above-mentioned witnesses do not necessarily qualify as witnesses identified with an adverse party. Therefore, they object, pending a demonstration of hostility and ruling from the Court permitting leading questions.

Federal Rule of Evidence 611(c) bars an attorney from using leading questions on direct examination unless the attorney is examining a hostile witness, an adverse party, or a witness identified with an adverse party.  M.J., E.R., and A.O. are, at a minimum, witnesses identified with an adverse party.  Prior to the adoption of Rule 611(c), before a party could lead a witness on direct examination, it had to be shown that the witness was either actually hostile or an adverse party, officer, director, or managing agent of such adverse party. *Haney v. Mizell Mem'l Hosp.*, 744 F.2d 1467, 1477–78 (11th Cir. 1984). Rule 611(c), however, significantly enlarged the class of witnesses presumed hostile, "and therefore subject to interrogation by leading questions without further showing of actual hostility." *Id*. (internal citations omitted) (finding that a witness called by the plaintiff—an employee of a defendant when alleged malpractice occurred—"certainly was identified with a party adverse to" the plaintiff, and the district court, under Rule 611(c), should have permitted plaintiff to ask witness leading questions without establishing actual hostility). Under Rule 611(c), the Government should be permitted to use leading questions during the direct examination of Defendant Jimenez's father and cousin as well as Defendant Serrano's fiancée.

**IV.   Fair and Accurate Photographs are Admissible**.

The Government intends to introduce into evidence an image of a vehicle and its occupant passing through a Florida toll plaza. Sunpass provided this image along with a certificate of

authenticity, under Fed. R. Evid. 902(11). A Sunpass camera captured the image during nighttime hours.

An FBI agent opened this image on his computer using a standard, commercially available Microsoft program called "Photos." Once opened, the agent took three simple steps to adjust the contrast: the agent (1) selected "Edit"; (2) selected the icon for adjusting light/darkness; and (3) slid two different scales to achieve a more discernable image.[3] The original image from Sunpass is below (left) as Exhibit 2, incorporated herein, and the resulting image is below (right) as Exhibit 3, incorporated herein:



Assuming relevance, the original is admissible pursuant to the 902(11) certificate, and the agent's image is admissible as a fair and accurate depiction of the original he received from Sunpass.

Pursuant to Local Rule 88.9, Defendant Jimenez took no position on this matter considering it irrelevant to Defendant Jimenez. Defendant Serrano objects to the agent's image, asserting the photograph is altered and, therefore, not a fair and accurate depiction of the original.

---

[3] The Government video recorded the agent engaging in these steps for reference. *See* Exhibit 4, submitted to the court under separate cover. The Government provided a copy to the defense in discovery.

The predicate for introducing a photograph is the witness testimony that he recognizes what is depicted in the photograph, and that the photograph fairly and accurately depicts that person, place, or thing. Under Rule 901(a) of the Federal Rules of Evidence, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must present "sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be." *United States v. Ramirez*, 658 F. App'x 949, 952 (11th Cir. 2016) (citing *United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012)). Here, the 902(11) certificate establishes the authenticity of the original photograph, and the agent's testimony establishes that the second image "is what it purports to be," that is, a copy of the original photograph, adjusted for light.

Just like plotting cellular location data (as mentioned above), sliding a scale to adjust a photograph takes no particular skill, and is, in fact, something people regularly do to edit contrast, color, crop, expose, (to name a few) an image. Here, the resulting image still accurately depicts the original, just adjusted for light. The image, now lighter or darker in some places—making the image's content more pronounced—does not suddenly cease to fairly and accurately depict the person, place, or thing any more than adjusting the brightness setting on a television changes the show into a different show.

A duplicate photocopy which accurately reproduces the original is admissible to the same extent as the original. Fed. R. Evid. 1002. This remains the case unless the opposing party raises a genuine question as to the *authenticity* of the unintroduced original, the *trustworthiness* of the duplicate, or the fairness of substituting the duplicate for the original. Fed. R. Evid. 1003. *See Buczek v. Trans Union LLC*, No. 05-80834 CIV, 2006 WL 3666635, at *2 (S.D. Fla. Nov. 9, 2006) (citing *United States v. Georgalis*, 631 F.3d 1199 (5th Cir.1980)). In the instant case, there is no substitution of the agent's image for the original—the Government intends to introduce both. As

9

such, arguments about the difference between the two go to the weight of the evidence, and not the admissibility of photograph itself. *See e.g. United States v. Clayton*, 643 F.2d 1071 (5th Cir. 1981); *see also United States v. Seifert*, 351 F. Supp. 2d 926, 928 (D. Minn. 2005) (finding "that adjustments to brightness or contrast, or enlargement of the image, while arguably a manipulation, are in fact no more manipulative than the recording process itself" and noting other factors, like a camera's lens, aperture, shutter speed, or development process, "all affect the image," but it is "entirely unremarkable so long as the 'image' remains an accurate recording of that which occurred before the camera"), aff'd 445 F.3d 1043 (8th Cir. 2006).

    **V.**    **Opening the Door to Evidence of Defendants' Connection to Additional Suspects in Murder-For-Hire Plot**

As the Government previously advised, the Government does not intend on presenting evidence or making arguments that a particular person or persons had motive to hire or solicited or paid the Defendants to commit the acts alleged. The Government has suspects in that regard, namely R.R., R.A., and T.M. But, as a possible defense, the Defendants may present evidence, conduct examinations, or make arguments to the effect that either the Defendants had no motive to commit the alleged acts or that other persons, rather than the Defendants, had the motive to commit the crimes alleged. The Defendants' problem is that most roads lead back to them—through R.R., R.A., and T.M.—and the Defendants may "open the door" to such evidence.

As background this Court has heard before, R.R. and the victim were business partners who ended their dealings in a cantankerous federal lawsuit. At the time, R.R. made veiled threats against the victim. R.R. is also close friends with R.A., who manages T.M., a music artist. T.M. sent funds to Defendant Serrano who—in August 2019—used those funds to buy himself last minute travel to South Florida. Defendant Serrano gave a portion of those funds to Defendant Jimenez, who also purchased last minute travel on the same plane to South Florida. Once in South

10

Florida, Defendant Serrano spent multiple days with R.A. when he was not surveilling the victim, culminating in Defendant Serrano's purchase of R.A.'s father's vehicle—at a reduced price—days after the shooting. Defendant Serrano used this vehicle to travel back to New York.

In the days after the shooting, the victim provided law enforcement with names of persons he thought might want to harm him. Among the information provided, the victim named R.R. and others related to R.R. If the defense presents evidence, questions witnesses, or lays the groundwork for arguing that R.R. or those related to R.R. had the motive to harm the victim, the defense would open the door to evidence connecting R.R. to R.A. and T.M.[4] In fact, if the Defendants instead cherry pick those names that do not link to R.R., the Court should still allow the Government to present evidence the Defendants are linked to R.R., R.A., and T.M. If the Defendants are permitted to present evidence or arguments that someone else either had a motive to or did commit the acts alleged, the jury will be misguided unless the Government is allowed to demonstrate there is a more reliable evidentiary chain linking the Defendants to the crime.

Pursuant to Local Rule 88.9, Defendant Jimenez has no objection. Defendant Serrano's response was unclear to the Government, but he appears to assert that the Government's anticipated evidence—as set forth in FN 4 herein—already opens the door. But, as laid out in the footnote, the Government presently intends to introduce only limited evidence regarding T.M. and R.A., and no evidence relating to R.R.

---

[4] The Government intends to introduce proof of T.M.'s transferring funds to Defendant Serrano via CashApp for the sole purpose of demonstrating the immediate expenditure towards travel to South Florida. The Government intends to introduce evidence relating to R.A. for the sole purpose of demonstrating who Defendant Serrano was with and what he was doing when he was not surveilling the victim, as well as to demonstrate his familiarity with R.A., who arranged for Defendant to buy the car Defendant used to leave South Florida. The Government does not intend to introduce any evidence relating to R.R.

### VI.     Transcript of Jail Call Is Properly Redacted under the Rule of Completeness

The Government intends to offer into evidence a transcript of a call the Federal Detention Center recorded between Defendant Jimenez and his mother. During that call, Jimenez made incriminatory statements intermingled with statements by him and his mother that are unnecessary to place the admissible evidence into context. They each comment on the future, hope, the Defendant's son, family, and second chances—all topics likely to elicit an emotional response and to be unfairly prejudicial to the Government. Most importantly, these statements are irrelevant. A full transcript of the conversation is attached hereto as Exhibit 5 with proposed redactions. After conferring with the Defendants as required by Local Rule 88.9, both Defendant Jimenez and Defendant Serrano object under the Rule of Completeness.

"Under the common law rule of completeness, an opponent against whom a part of an utterance is admitted may complement it by submitting the remainder, in order to give the jury a complete understanding of the 'total tenor and effect of the utterance.'" *United States v. Santos*, 947 F.3d 711, 729 (11th Cir. 2020) (internal citation omitted). As partially codified in Fed. R. Evid. 106, the rule states: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." *Id*. at 729–30. Rule 106 "does not automatically make the entire document admissible" once a portion has been introduced. *Id*. at 730. Rather, Rule 106 "permits introduction only of additional material that is *relevant* and is *necessary* to qualify, explain, or place into context the portion already introduced." *Id*. (internal citations omitted) (emphasis added). Although Rule 106 on its face applies only to written or recorded statements, this Court has extended the rule to the exculpatory portions of a

criminal defendant's post-arrest oral statements. *Id*. (citing *United States v. Range*, 94 F.3d 614, 620-21 (11th Cir. 1996)).

There is nothing about what the defense wants included in the transcript submitted to the jury that would help put into context or elucidate the portion the Government wants them to read.

### VII. The Fact the Defendants Have Infant Children is Not Relevant and Should Be Excluded

Both Defendants have infant children. Defendant Serrano's fiancée has brought the young child to court. The existence of infant children does not tend to prove or disprove a material fact, and, so, is not relevant. *See* Fed. R. Evid. 401. Even if marginally relevant, the evidence proves so little—and has the ability to enflame passions so much—that it is not admissible under Fed. R. Evid. 403. Upon conferring, Defendant Jimenez believes this fact is relevant to establishing the nature of his relationship with Raven Sauri, a witness the Government intends to call who also mothered his child. Defendant Serrano asserts such evidence may be relevant, depending on the testimony elicited from Defendant Serrano's fiancée, but would otherwise agree that it is irrelevant.

### VIII. A Witness Cannot be Impeached With Another Witness' Statement

The victim in this case was an ardent advocate with law enforcement for finding the people who tried to kill him and, if there were people that put them up to it, them, too. As a result, he engaged in text communications with the local lead detective in the days and months after the shooting. Pursuant to Local Rule 88.9, both Defendant Jimenez and Defendant Serrano believe that such text threads are "proper impeachment."

Yes, a lawyer can impeach a testifying witness with their statement or demonstrate their bias by revealing the content of text messages. The Government agrees that during cross-examination of the victim the defense can question him about conversations he had with the lead

13

detective to establish the victim's bias and credibility. Likewise, the Government agrees that during cross-examination of the lead detective the defense can question him about conversation he had with others that demonstrate his bias and credibility. The Government writes here to notify the Court that there are statements by the non-testifying witness in such exchanges that do not serve the purpose of demonstrating bias and credibility. Where the non-testifying witness said something in a text message that does not affect the testifying witness' state of mind, such statements do not impeach the testifying witness and are either hearsay or irrelevant or constitute improper opinion testimony.

        Respectfully submitted,

        MARKENZY LAPOINTE
        UNITED STATES ATTORNEY

By:  */s/ Michael E. Gilfarb*
       Michael E. Gilfarb
       Assistant United States Attorney
       Fla. Bar. No. 957836
       99 N.E. 4th Street
       Miami, FL 33132-2111

**CERTIFICATE OF SERVICE**

    **I HEREBY CERTIFY** that on August 1, 2023, I served a copy upon all counsel of record using CM/ECF.

By:  *s/Michael E. Gilfarb*
       Michael E. Gilfarb
       Assistant United States Attorney