UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-20389-CR-ALTMAN

UNITED STATES OF AMERICA,

  Plaintiff,

v.

JULIAN JIMENEZ,

  Defendant.
_____/

**OBJECTIONS TO THE DRAFT PRESENTENCE
INVESTIGATION REPORT AND REQUEST FOR DOWNWARD VARIANCE**

Julian Jimenez, through undersigned counsel, respectfully files the following objections to the draft Presentence Investigation Report (PSI) (DE 245), and, per the Court's Order Setting Date, Time, and Procedures for the Sentencing Hearing (DE 208) moves for a downward variance from the advisory sentencing guidelines.

  **I.   PSI Objections and Corrections**

  **A. Factual Corrections and Amendments**

Paragraph 47 of the draft PSI states that Mr. Jimenez was placed in a special education program during the seventh grade. Paragraph 59 states that Mr. Jimenez experienced difficulties during middle school.

Mr. Jimenez, in fact, experienced difficulties throughout his school years, beginning in elementary school. Around third and fourth grades, he was experiencing major difficulties in keeping up with his class; during those years, he stayed in the hallway during the entire school day. He was subsequently evaluated and diagnosed

1

with an unspecified learning disability. After his diagnosis, around the fourth grade, he was placed in a special education school. He stayed at the special education school until middle school, at which time he returned to a regular school. Though he returned to a mainstream school, he continued to attend special education classes until he left school in the 10th grade.

Paragraph 60 of the draft PSI states that Mr. Jimenez has been unemployed since his arrest on August 10, 2022. Mr. Jimenez sought out work at the Federal Detention Center; since approximately January of this year, he has worked as a unit orderly at FDC. In that position, he sweeps and mops his residential unit and cleans up after mealtimes. He earns $9 per month.

### B. PSI ¶ 30: Permanent or Life-Threatening Bodily Injury, USSG § 2A2.1(b)(1)

In the draft PSI, probation has recommended a four-level enhancement pursuant to USSG § 2A2.1(b)(1)(A), which applies "[i]f…the victim sustained permanent or life-threatening bodily injury." (PSI ¶ 30). Mr. Jimenez objects to the application of the four-level enhancement, as well as the characterization in paragraph 13 of the PSI that states that the victim sustained permanent disfigurement as a result of the shooting and resulting surgeries.

Mr. Jimenez respectfully requests this Court honor the agreement of the parties with respect to the applicable enhancement for the victim's injury. Namely, in the plea agreement, the parties agreed to jointly recommend that the base offense level of 33 be increased by **2 levels**, as a result of the victim in this case sustaining serious bodily injury—rather than the 4-level enhancement for permanent bodily

injury—pursuant to USSG § 2A2.1(b)(1)(B). (DE 206 ¶8(b)). The Court, of course, is not bound by the agreement of the parties. Mr. Jimenez respectfully requests, however, that the Court accept this recommendation, which was a critical part of the negotiated resolution of this case.

To be sure, the victim in this case sustained serious bodily injury, as a result of his shooting on August 27, 2019. Serious bodily injury, pursuant to USSG § 1B1.1, Application Note 1(M), which is the definition referenced in the Application Note to § 2A2.1, "means injury involving extreme physical pain or the protracted impairment of a bodily member, organ, or mental faculty; or requiring medical intervention, such as surgery, hospitalization, or physical rehabilitation." USSG § 1B1.1 cmt. n.1(M). The victim was shot twice, and surely experienced extreme physical pain as a result. Records provided in discovery indicate that he was hospitalized and underwent surgery several months after the shooting to remove bullet fragments. Photographs provided in discovery support that the victim sustained scarring to his upper back and side as a result of the shooting and surgeries, but do not show obvious permanent disfigurement. Mr. Jimenez, thus, requests the Court apply the two-level enhancement for serious bodily injury, as set forth in USSG § 1B1.1(b)(1)(B), and as agreed by the parties.

**C. Offer or Receipt of Anything of Pecuniary Value USSG § 2A2.1(b)(2)**

The draft disclosure of the PSI does not include an enhancement pursuant to USSG § 2A2.1(b)(2). Following the disclosure of the draft PSI, however, in emails sent to the parties on October 4 and 5, 2023, U.S. Probation Officer Michael Soto wrote

3

that he intends to include a four-level enhancement, pursuant to USSG § 2A2.1(b)(2), which applies "[i]f the offense involved the offer or receipt of anything of pecuniary value for undertaking the murder…." USSG § 2A2.1(b)(2). The Probation Officer has not yet amended the PSI to reflect his stated intent.

Mr. Jimenez objects to the application of this enhancement. Mr. Jimenez requests that the Court accept the joint recommendation of the parties to not apply this specific offense characteristic, as set forth in the plea agreement. The parties agreed to jointly recommend that the applicable base offense level under USSG § 2A2.1 is level 33; the only specific offense characteristic that applies is for serious bodily injury, which increases the offense level by 2; thereby resulting in an adjusted offense level of 35; and a total offense level of 33, after accounting for a 2-level decrease for acceptance of responsibility. (DE 206 ¶ 8). While the parties' agreement does not bind the Court, Mr. Jimenez asks the Court to adopt the parties' joint recommendation.

## II.   Request for Downward Variance

Mr. Jimenez is requesting that the Court impose a sentence below the advisory guideline range in this case. To be sure, the offense in this case was a very serious one. Mr. Jimenez is in no way minimizing the gravity of the offense or making excuses for his actions. Indeed, he pled guilty to these offenses, has accepted responsibility, and understands that the consequences will be commensurately serious. A full consideration of the factors set forth in 18 U.S.C. § 3553(a) however, supports the imposition of a sentence below the guideline range in this case. At sentencing, Mr.

Jimenez, through counsel, will provide further information in support of a sentence below the advisory guidelines range. Below are highlighted some key factors for the Court's consideration.

### A. History and Characteristics of the Defendant

#### 1. Mr. Jimenez's Youth

At the time of sentencing, Mr. Jimenez will be 27 years old. At the time of the offense, however, he was just 23 years old. Mr. Jimenez's youth at the time of the offense does not excuse his conduct. But it is a critical consideration for the Court when determining a sentence that is sufficient but not greater than necessary to reflect the goals of sentencing.

Neuroimaging studies have shown that brain development—particularly frontal lobe development—continues well into an individual's 20s, likely not reaching full maturity until about age 25.[1] The frontal lobe houses areas of the brain responsible for reasoning, decision-making, and impulse control. The brain of an individual in his early 20s has simply not completed its development in these crucial areas. This helps explain why many teenagers and young adults tend to make poor decisions, lack impulse control, and engage in risk-taking behaviors.[2]

Mr. Jimenez's brain—particularly the areas that control reasoning and decision-making—had not reached full maturity at the time of the offense conduct.

---

[1] Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 453 (2013), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/pdf/ndt-9-449.pdf.
[2] *Id.* at 453-56.

Today, more than four years later, his brain likely has completed its development in these critical areas, allowing him to better self-regulate and make reasoned decisions with a full understanding of their consequences. And no matter the sentence the Court imposes as to Counts 1 and 2, Mr. Jimenez will be well into mid-life at the time of his release, as a result of the consecutive 10-year mandatory minimum sentence that will be imposed as to Count 3. A sentence below the guideline range as to Counts 1 and 2, together with the mandatory 10-year sentence as to Count 3, will accordingly take account of Mr. Jimenez's youth at the time of the offense while nonetheless reflecting the seriousness of the offense and the need to protect the public.

### 2. Mr. Jimenez's Relationship with Mr. Serrano

Another contributing factor to Mr. Jimenez's involvement in this offense was his relationship with co-defendant Jaime Serrano. Mr. Jimenez was raised in the Bronx, primarily by his mother, after his parents separated when he was around four years old. When Mr. Jimenez's father moved out, he was largely absent from his son's life. The senior Mr. Jimenez works as a sound engineer for a popular musical artist; by his own account, he prioritized his career over his son. He traveled frequently for work. While he provided financial support to his son, he was not involved in Julian's day-to-day upbringing.

Julian was deeply affected by his father's absence from his life. He has always sought the approval of his father and other male family members. Throughout his young life, he has turned to his extended family, looking for replacement father figures. He was close with two of his paternal uncles, who lived nearby in the Bronx

when he was young. Sadly, these two uncles passed away when Julian was still an adolescent.

Mr. Jimenez next became close with his cousin Esther's husband, Aaron Rodriguez. Mr. Rodriguez provided guidance to Mr. Jimenez; he, too, had a rough start in life in the Bronx, getting into some trouble as a young man. Mr. Rodriguez turned his life around, however, after his son, Aaron, Jr., was born. He secured a good job as a city sanitation worker and counseled Mr. Jimenez to do the same. Mr. Rodriguez and Mr. Jimenez had a close familial bond even after Mr. Rodriguez and his wife separated. Tragically, Mr. Rodriguez was murdered in 2017. Mr. Jimenez felt this loss deeply. Once again, he had lost both his close friend and the person who had served as his mentor.

It was around this time that Mr. Jimenez became closer with Jaime Serrano. Mr. Jimenez had known Mr. Serrano his entire life, because their two families attended the same church and were deeply connected in their community in the Bronx. Serrano, however, is much older than Mr. Jimenez; at the time of sentencing, he will be nearly 47 years old. Serrano is much closer in age to Mr. Jimenez's father, Mikey, than he is to Julian. Indeed, Mikey Jimenez told law enforcement that he and Serrano had grown up together in the church. Also, like the senior Mr. Jimenez, Serrano was involved in the music business. For these reasons, Mikey Jimenez encouraged the relationship between Serrano and his son. He mistakenly thought Serrano could be a good influence on Julian and told law enforcement that he knew Julian looked up to Serrano.

7

Mr. Serrano, too, was aware of all these dynamics. He took advantage of the influence he had over Mr. Jimenez when he enlisted Julian's participation in this offense. The government recognized as much in its closing argument at Mr. Serrano's trial:

> The defendant [Serrano] and Jimenez are generational family friends. The defendant in his 40s, Jimenez in his 20s. You heard Jimenez's father say, "I know the defendant as "Disco," as "Jay," as all of those other names, "but I also know him as Jaimito." That's how close their families are.
>
> You know that Jimenez looks up to this defendant…. And that matters because that's why the defendant had him holding the gun. That's why the defendant didn't do this crime himself. He had his nephew do it. He had his nephew do the shooting thinking that he would get away.

(Transcript of Government's Closing Arguments, p. 13, attached hereto as Exhibit A). Again, the relationship between the two does not excuse Mr. Jimenez's conduct. It is critical, however, in understanding how Serrano was able to convince Mr. Jimenez, a young man with no prior criminal history, to participate in this serious offense.

### 3. Mr. Jimenez's Cognitive and Intellectual Deficits

In determining an appropriate sentence, the Court should also consider Mr. Jimenez's intellectual deficits as a contributing factor to his involvement in this offense. Mr. Jimenez struggled in school from a very young age. While in elementary school, he was diagnosed with an unspecified learning disability. As noted above, after he was diagnosed, he attended special education classes for the rest of his school years—first in a special education school, and later in special education classes within a regular school.

Mr. Jimenez's deficits left him more susceptible to the manipulation and influence of Serrano. The government acknowledged as much at Mr. Serrano's trial. Indeed, it was a focus of the government's closing argument:

> [Mr. Serrano] was smart enough to have Julian Jimenez, his nephew, his generational family friend, who's been in special ed. classes his entire life, that is what's in evidence, he was smart enough to have him be the sucker, to have him hold the gun, to have him do the shooting, in hopes that he would get away."

(Ex. A, Transcript of Government's Closing Arguments, p. 9).

As detailed in paragraph 16 of the PSI, Serrano's manipulation of Mr. Jimenez did not end with his enlistment of Mr. Jimenez in the offense conduct. After they were arrested, Mr. Serrano convinced Mr. Jimenez to sign a statement attempting to exonerate Mr. Serrano by falsely claiming Mr. Jimenez acted alone. (PSI ¶ 16). Mr. Jimenez's agreement to do so demonstrates his naiveté, lack of sophistication, and susceptibility to Mr. Serrano's manipulation.

Mr. Jimenez's background and personal characteristics do not excuse his conduct. They are critical, however, in understanding how a young man like Mr. Jimenez, with no prior convictions, is before this Court for sentencing in a case as serious as this one. And, as set forth above, his background supports a sentence below the advisory guidelines.

### B. The Need to Avoid Unwarranted Sentencing Disparities

The Court must also consider the need to avoid unwarranted sentencing disparities when determining an appropriate sentence. 18 U.S.C. § 3553(a)(6). Mr.

9

Jimenez urges the Court to consider the following measures regarding potential sentencing disparities.

The parties have agreed to jointly recommend a total offense level of 33. (DE 206 ¶ 8). Mr. Jimenez is in criminal history category I, with zero criminal history points. (PSI ¶ 39). The advisory guideline range as to Counts 1 and 2, per the parties' agreement, is 135-168 months. The guideline sentence as to Count 3 is the mandatory minimum: 120 months. (PSI ¶ 28). The total advisory guideline range would therefore be 255-288 months.

Undersigned counsel used the Judiciary Sentencing Information tool (JSIN) to determine the length of imprisonment imposed on defendants convicted of similar offenses within the last several years. The JSIN platform is an online sentencing data tool developed by the U.S. Sentencing Commission. It "provides cumulative data, based on five years of sentencing data for offenders sentenced under the same primary guideline, and with the same Final Offense Level and Criminal History Category selected."[3]

Using the JSIN tool revealed that, during the last five years, three defendants were sentenced who were similarly situated to Mr. Jimenez. For these three defendants, like Mr. Jimenez, the primary guideline was USSG § 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder), and each was convicted of at least one count of 18 U.S.C. § 924(c), with a final offense level (for the non-§ 924(c) count) of 33

---

[3] United States Sentencing Commission, Judiciary Sentencing Information, available at https://www.ussc.gov/guidelines/judiciary-sentencing-information.

and a criminal history category of I. The average length of imprisonment for these similarly situated defendants was 200 months, with a median length of imprisonment of 180 months. Screenshots of these results are attached hereto as Exhibit B. Both the average and median sentences imposed on these similarly situated defendants are significantly lower than the low end of the advisory guideline range for Mr. Jimenez, as agreed upon by the parties, after including the 120-month mandatory penalty for Count 3.

For the purpose of comparison, undersigned counsel also used the JSIN tool to determine the average and median length of imprisonment imposed on defendants convicted of first-degree murder, who also received a 2-level downward adjustment for acceptance of responsibility and were in criminal history category I. The applicable guideline for first-degree murder is at USSG § 2A1.1; that guideline provides a base offense level of 43, with no adjustments for specific offense characteristics. During the five-year period from 2018-2022, 16 defendants were sentenced whose primary guideline was § 2A1.1, with a final offense level of 41 (reflecting a 2-level adjustment for acceptance of responsibility) and a criminal history category of I. For these defendants, the average length of imprisonment was 291 months, and the median length of imprisonment was 330 months. Screenshots of these results are attached hereto as Exhibit C.

To avoid unwarranted sentencing disparities, Mr. Jimenez requests this Court impose a sentence below the guideline range. The advisory guidelines here provide a range that—at the high end—is almost equivalent to the average term of

11

imprisonment imposed on federal defendants who committed first-degree murder. Even the low end of the advisory guideline range is significantly higher than either the average or median term of imprisonment imposed on federal defendants who committed attempted murder and were similarly situated to Mr. Jimenez in terms of offense level and criminal history category. The average length of imprisonment imposed on such defendants was 200 months—more than 4 ½ years less than the *low end* of the guideline range that applies here.

### III. Conclusion

The Court is well versed in the circumstances of this case, having presided over the trial of co-defendant Serrano. To date, however, the Court has naturally had less information regarding Mr. Jimenez's background and characteristics. Mr. Jimenez is a young man with no criminal history. His youth and background left him particularly vulnerable to the manipulation of a close family friend.

The parties were able to reach a negotiated resolution of this case. Mr. Jimenez has pled guilty and accepted responsibility for his grievous errors. He now faces a mandatory 10-year penalty as to Count 3, which must run consecutive to the sentence the Court imposes as to Counts 1 and 2, resulting in a very lengthy total term of imprisonment.

A sentence within the advisory guideline range in this case is greater than necessary to achieve the purposes of sentencing. Mr. Jimenez's background weighs strongly in favor of a sentence below the guideline range, as does the need to avoid unwarranted sentencing disparities. To be sure, the offense was a very serious one, and the sentence must reflect the seriousness of the offense, promote respect for the

law, and provide just punishment. Because of the consecutive 10-year mandatory penalty in this case, a sentence below the advisory guideline range will be sufficient to achieve all these aims.

WHEREFORE, for the reasons set forth above and as will be further detailed at the time of sentencing, Mr. Jimenez respectfully requests that the Court sustain his objections to the draft PSI and impose a sentence below the advisory guidelines.

Respectfully Submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By: */s/ Abigail Becker*
Assistant Federal Public Defender
Florida Bar No. 72284
150 W. Flagler Street, Suite 1700
Miami, Florida 33130
Tel: 305-530-7000
Abigail_Becker@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on **October 18, 2023**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Abigail Becker*